Automatic Shifters, Inc. v. Commissioner.
Automatic Shifters, Inc. v. Commissioner
Docket No. 72230.
United States Tax Court
T.C. Memo 1960-134; 1960 Tax Ct. Memo LEXIS 153; 19 T.C.M. (CCH) 694; T.C.M. (RIA) 60134; June 27, 1960
*153 A payment by petitioner which was directly related to petitioner's right to receive royalties from certain patents, held, capital in nature. American Envelope Co., 29 T.C. 307 (1957). Petitioner's right to amortization of the payment determined. F. Elmore Butler, Esq., P.O. Box 5021, Richmond, Va., for the petitioner. Charles C. Shaw, Jr., Esq., for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: The respondent determined deficiencies in petitioner's income tax and personal holding company surtax for the taxable year ended March 31, 1954, in the amounts of $4,397.26 and $15,989.75, respectively. By stipulation, the parties have resolved the issue relating to the personal holding company surtax, and certain other issues. The only issue for decision is whether the amount of $12,500 paid by petitioner to Empire Electric Brake Company was a capital expenditure for an intangible depreciable asset, entitling petitioner to an allowance for depreciation over the life of the asset, and thus a pro rata deduction for the year 1954. Findings of Fact Some of the facts are stipulated and are hereby found as stipulated. The *154 petitioner is a corporation whose office is located in Richmond, Virginia, and it filed its income tax return for its fiscal year ending March 31, 1954, with the director of internal revenue at Richmond. At all times material herein, the petitioner has been on an accrual basis for purposes of reporting income. Sometime prior to March 12, 1943, petitioner obtained the right to practice and the right to sublicense others to practice five inventions of William Stelzer (hereinafter referred to as Stelzer) relating to hydraulic brake boosters and systems. On March 12, 1943, petitioner entered into an agreement (hereinafter referred to as the Empire license) with the Empire Electric Braking Company (hereinafter referred to as Empire), whereby Empire was granted the exclusive sublicense and right, throughout the United States, including the right to grant further sublicenses, to make or vend, or have others make or vend for it, the apparatus or devices embodying inventions disclosed in the above five hydraulic braking patents and any reissues thereof, and in certain other future patents, if any, not here relevant. Pursuant to the agreement between petitioner and Empire, petitioner was *155 entitled to receive royalties equal in amount to 50 per cent of the net profits derived from the manufacture or sale of devices covered by these patents. "Net profit" was defined in the agreement as the "net profit collected and received by Empire from the manufacture or sale of apparatus or devices covered * * * after deducting" costs incurred, including manufacturing costs, profits paid to other manufacturers or sellers of the device for Empire, promotional expenses, and Empire's overhead expenses, "allocable to the exploitation of such apparatus or devices * * *." On November 30, 1944, Empire, pursuant to its right to further sublicense, entered into a sublicensing agreement (hereinafter referred to as the Kelsey sublicense) with Kelsey-Hayes Wheel Company (hereinafter referred to as Kelsey) involving the same five Stelzer patents. This agreement originally provided for royalty payments from Kelsey to Empire of five per cent of the net selling price of the power boosters for brakes sold. This agreement of November 30 was amended in certain respects by agreements dated March 20, 1947, and August 16, 1949. Pursuant to this agreement of November 30, as amended, Kelsey paid royalties *156 directly to Empire. The petitioner did not receive any royalties from Kelsey, nor did Empire pay over any royalties to the petitioner out of the amount it received from Kelsey. None of the royalties paid by Kelsey to Empire were in turn paid to petitioner because Empire, having incurred costs, had not realized any "net profits," 50 per cent of which would be payable to petitioner under the Empire license. On February 17, 1949, petitioner and Empire agreed that Empire's total expenses incurred from 1943 to 1947, to be recovered before there would be any net profits, were in the amount of $329,292.46. After certain adjustments not here relevant, it was agreed that the amount of $149,646.23, for the purposes of the Empire license, represented the costs incurred by Empire to be recovered against petitioner's interest in the net profits before petitioner would be entitled to its share of these profits. On or about October 5, 1950, petitioner and Empire modified their understanding with respect to the $149,646.23 costs allocable to petitioner's interest in the Empire license. This modification was reflected in the minutes of the board of directors' meeting of petitioner of October 5, 1950, an *157 extract from which reads as follows: "[Empire] has over a period, expended sums of money on programs in which [petitioner] has an interest. A discussion ensued going into the matter in considerable detail. On motion duly made, seconded and unanimously carried, it was "RESOLVED: that [petitioner] recognizes that it is indebted to [Empire] in the sum of $25,000.00 as their [there] proportionate share (after adjusting various items) of expenses up to and including the calendar year ending December 31, 1950. This being in addition to $11,050.00 now set up on the books of [petitioner] as due Empire. It is understood that the item of $25,000.00 is to be a self-liquidating item over a period of time out of Royalties from the Booster not exceeding 50% of [petitioner's] share." The amount of $11,050 represented a previous advance that Empire had made to petitioner. There was no obligation on the part of petitioner at this time to pay the amount of $25,000 to Empire. The only effect of this modification was that the amount of $25,000 instead of $149,646.23 was to be considered petitioner's share of the costs incurred by Empire under the Empire license. As a consequence, *158 as soon as Empire recovered the amount of $50,000 in costs, it would begin to pay petitioner royalties. In all other respects, the understanding between petitioner and Empire with respect to the Empire license remained the same. As of November 16, 1950, Empire had received royalties from Kelsey in the amount of $36,918.03, no part of which had been paid to petitioner, due to Empire not having realized any net profits. As a consequence, petitioner had not paid any royalties to Stelzer, pursuant to the original licensing agreements between them. Stelzer complained to Kelsey about this situation. Kelsey wished to avoid getting involved in any controversy among the licensors. Accordingly, on November 16, 1950, Stelzer, petitioner, Empire, and Kelsey entered into an agreement which provided, among other things, that Stelzer and petitioner would each receive directly from Kelsey 25 per cent of the total royalties payable by Kelsey pursuant to the Kelsey sublicense, as amended, and Empire was to receive the remaining 50 per cent. It was understood between petitioner and Empire that petitioner would pay over the royalties received by it pursuant to the agreement of November 16, 1950, to *159 Empire until Empire had received the sum of $25,000. However, petitioner needed to finance some other patents covering other devices not here involved, and after conferring with Empire, Empire allowed petitioner to retain a portion of these royalties for the time being. The petitioner received from Kelsey pursuant to the agreement of November 16, 1950, royalty payments in the amounts of $1,941.68 on July 26, 1951, $2,612.54 on November 2, 1951, and $2,335.96 on January 17, 1952. As a result of further negotiations between petitioner and Empire, a compromise was reached on the "indebtedness" of $25,000 owing from petitioner to Empire, whereby Empire agreed to accept the amount of $12,500 in full payment. At a meeting of petitioner's directors on November 1, 1951, it was resolved that "with respect to the indebtedness of [petitioner to Empire] in the amount of $12,500.00 on account of BOOSTER DEVELOPMENT COSTS, the officers of this Corporation are hereby * * * directed to execute its six (6) months promissory note to [Empire] in the sum of $12,500.00 dated Nov. 1, 1951, * * *." On November 1, 1951, the petitioner executed a note for $12,500 to Empire due six months from date, *160 bearing interest at the rate of one per cent per annum. The note was renewable for periods of six months if at or before maturity, or the maturity of an extended period, a payment of $4,000 was made on the note. However, the payment of $4,000 was conditioned upon the receipt of royalties from Kelsey during the six months immediately preceding the maturity of the note. At no time was the payment to exceed 70 per cent of the royalties received or $4,000, whichever was greater, and in no event was the payment to be less than $1,000 in each six-month period. During the fiscal year ending March 31, 1952, the petitioner paid $1,000 on this note. During its fiscal year ending March 31, 1953, the petitioner further paid $1,700 on the note, and during its fiscal year ending March 31, 1954, it made two payments, one in the amount of $3,300 and one in the amount of $6,500. On its income tax return filed for the fiscal year ending March 31, 1954, the petitioner deducted the foregoing payment of $3,300 on its note to Empire as part of its claimed deduction for "Patent expense." The Commissioner has disallowed this deduction. In its petition, petitioner contended that this amount and the additional *161 note payment of $6,500 should have been allowed as a deduction. Opinion On brief, petitioner no longer contends that it is entitled to deduct the entire amount of $9,800 paid in the fiscal year 1954. It now contends that it is entitled to deduct for the year 1954 a pro rata portion of the entire amount of $12,500 paid to Empire in compromise of the amount chargeable against its royalty interest in the Empire license, as a capital expenditure attributable to the acquisition of its royalty interest in the Kelsey sublicense as amended by the agreement of November 16, 1950. Respondent's only contention is that the $12,500 is an ordinary and necessary business expense accrued and deductible only in the year 1951. Insofar as actual indebtedness is concerned, there was none owing from petitioner to Empire prior to November 1, 1951, when petitioner executed its note in the amount of $12,500. Petitioner speaks of a "legal obligation" arising as of November 16, 1950, to pay Empire the amount of $25,000. However, we do not understand it to contend that this was an actual indebtedness to Empire. In any event, the point is not material. The substance of the transaction on November 16, 1950, was *162 that petitioner's royalty interest in the amended Kelsey license remained subject to the charge of $25,000 that had been determined to be its share of costs under the Empire license. By the compromise of that amount, it became entitled to take the royalties from Kelsey free of the obligation to remit them to Empire. The payment was directly related to petitioner's right to receive these royalties and whether, by way of compromise in settlement of a dispute or otherwise, the expense was capital in nature. American Envelope Co., 29 T.C. 307 (1957). Petitioner is entitled to amortize the total payment of $12,500 over the remaining life, as of November 1, 1951, of the Kelsey sublicense; the last patent covered by the sublicense would expire on January 12, 1960. Petitioner is entitled to a pro rata deduction for the year 1954 based on the remaining life of the Kelsey sublicense. Decision will be entered under Rule 50.